The following is the case submitted to this Court:
On the trial of the issue, one Ragan, a witness for the prosecution, deposed that one night in November, 1839, he was at a shop in Raleigh kept by himself and one Aaron Johnson, the father of the prisoner. The prisoner, the deceased, one O'Brien, and the witness were there. A quarrel arose between O'Brien and the prisoner, who struck O'Brien two blows. They were separated and the prisoner went out. When witness went to close the door, the prisoner came to the door. Beasley (the deceased) asked the prisoner what was the use of having such a fuss. Prisoner asked him if he took it up. He said he did not. (355) Prisoner said he was not afraid of him, to which deceased replied by affirming that he was not afraid of prisoner. And thereupon prisoner immediately raised his arm, and a pistol fired. Prisoner immediately went away; the deceased also went out, exclaiming, "I am a dead man!"
The death of the deceased from a wound then inflicted by the discharge of the prisoner's pistol was fully proved and was admitted.
The prisoner examined one Pollard, who deposed that on the night mentioned by Ragan he went to the shop to buy some fish. The deceased, who was acting as an assistant or clerk in the shop, went with the witness into a back room of the shop to get the fish. When witness came in, O'Brien and prisoner were quarreling, and when witness and the deceased returned into the shop from the back room, they were still quarreling, when the deceased told prisoner to behave himself. Prisoner asked the deceased if he took it up. Deceased said he did, and a smart quarrel ensued between them. After some time, prisoner said *Page 272 
he would go to bed. Deceased said he should not. Prisoner said it was hard if he could not go to bed in his father's house, and took a candle and went into the back room, and was in the act of ascending the stairs, which led to a bedroom above, when the deceased went up to prisoner, seized him by the collar, pulled him through the back room and shop to the front door, and pushed him out, kicking him at the same time. As this was done, witness (desirous of getting away from the fuss) got out of the shop and hastened away, and soon after heard the report of a pistol.
Several witnesses deposed that, within a few minutes after the pistol was fired, they heard the prisoner say that he had shot the deceased; that if it was to do again, he would do the same thing, and if any person touched him he would shoot him likewise; and he hoped the deceased would die and go to hell.
(356) Polly Mangum, examined for the State, deposed that on the same day the prisoner was at her house at dinner; said he had bought powder and shot, and intended to kill a man that night before the bell rung, and at the same time showed a pistol. She said to him: "Madison, why are you going to do so?" He replied, "Aunt Polly, is it not a shame that I should have to work all day in the hot sun?" She then asked him whom he intended to kill, to which he replied: "I name no names and value no law." At the time of this conversation, the prisoner had been drinking, but was in his senses.
This was all the material evidence, except to support and oppose the credit of the witnesses Ragan and Pollard.
The Attorney-General admitted that if the testimony of Pollard was true, the prisoner was guilty of but manslaughter; but he insisted that Pollard ought to be discredited, and Ragan should be believed, and that upon his evidence the prisoner was guilty of murder.
The prisoner's counsel commenced his address to the jury by admitting that, if Ragan's evidence was true, the prisoner was guilty of murder, and stated to the jury that the whole case, therefore, depended on the question, whether Ragan or Pollard should be credited, as upon the case as stated by the latter it was but manslaughter. The presiding judge here interrupted the counsel, and said he should instruct the jury, if they were satisfied that the prisoner had previous malice against the deceased, and went to the shop on the evening of the homicide with an intent to provoke a quarrel and revenge himself, he was guilty of murder, although Pollard's statement should be true.
The prisoner's counsel insisted that, in order to make this case one of murder, supposing Pollard's statement to be true, it must appear that the prisoner sought the provocation he received, or that he did not act under its influence; that his being at enmity with the deceased did not *Page 273 
make it necessary that he should take more from him than from a stranger or a friend; that the provocation proved by Pollard would reduce the crime to manslaughter, if committed on a friend or stranger, and would have the like effect when the person killed was an enemy, if he acted under the provocation; that if the prisoner went to the shop to bring on a quarrel as a pretense for killing, still he would not be guilty of murder if he did not bring on the quarrel, but acted in (357) truth upon the provocation then received, and would not have acted but from the provocation. And the prisoner's counsel further insisted that the provocation proved by Pollard was a sufficient and adequate motive for the prisoner's conduct, to which it was to be referred, unless by some proper evidence it was shown that he did not act from that motive, but from something deemed malice, or proof of malice. And the counsel contended that, in this case, there was no evidence proper to be left to the jury that the deceased was the object of the prisoner's threat, supposing Pollard's statement true, nor that he had malice or ill-will against him, nor that he sought or brought on the quarrel, nor that he acted but from the provocation proved by Pollard.
The judge, in leaving the case to the jury, after directing them that on Ragan's evidence the prisoner would be guilty of murder, and that the provocation stated by Pollard was sufficient in law to reduce the killing to manslaughter, instructed them, nevertheless, that although they should believe Pollard's evidence to be true, yet if, connecting the testimony of Polly Mangum with the other evidence in the cause, they could collect the fact that the deceased was the object of the threat deposed to by her, and that the prisoner went to the shop with the intention to provoke a quarrel with the deceased, in order to gratify his avowed vengeance, then the killing was murder, notwithstanding the facts proved by Pollard.
The opinion of the majority of the Court was delivered by
After an anxious consideration of this case, the Court is unable to find any grounds on which to pronounce the judgment rendered against the prisoner erroneous.
The only error alleged is because of misdirection of the presiding judge in his instructions to the jury. It has not been questioned, nor can it be questioned, but that it is the duty of a judge who presides at the trial of a cause, whether civil or criminal, to correct (358) every misrepresentation of law made to the jury, although admitted to be law by the parties or their counsel. He does not preside *Page 274 
merely as a moderator, to enforce order and decorum in a discussion addressed to a body, with whose deliberations he has no concern, and over whose judgment he is to exercise no influence; but he is an integral part of that mixed tribunal which is to pass upon the issue, and, while he is forbidden to give to the jury "an opinion whether any fact is sufficiently proven," he is bound to declare and expound to them the law arising upon those facts. Rev. Stat., ch. 31, sec. 136.
The alleged error is supposed to be partly in the instructions actually given and partly in declining to adopt, as a modification of those instructions, certain positions for which the prisoner's counsel contended on the trial.
The instruction given to which objection has been taken is that part of his Honor's charge wherein, after stating that the provocation testified to by Pollard was sufficient in law to reduce the killing to manslaughter, he added, "that, nevertheless, if, connecting the testimony of Polly Mangum with all the other evidence in the cause, they could collect the fact that the deceased was the object of the threat deposed to by her, and that the prisoner went to the shop (where the homicide was committed) with the intention to provoke a quarrel with the deceased, in order to gratify his avowed vengeance, then the killing was murder, notwithstanding the facts proved by Pollard." In support of this objection, it has been argued that a jury cannot collect any fact from evidence unless such evidence will rationally authorize the inference of the fact; that it is error in law to leave it to them to collect a fact, of which no testimony has been given, or none but of a vague and plainly insufficient character; and that, in the case under consideration, there was no testimony to warrant a finding that the denunciation of the prisoner was directed to the deceased; and, if possible, yet less that he went to the shop with intent to bring on a quarrel to gratify his (359) avowed vengeance. To us it seems that there was evidence fully warranting the jury in inferring the whole fact, the existence or nonexistence of which was left to their judgment. It was not a vague threat which the prisoner uttered. He avowed his determination to kill anindividual, whom, however, he refused to name, and to kill him that night; and he exhibited the instrument which he had prepared to carry this purpose into execution; and on that night, with that instrument of death concealed, he goes to the shop of which the deceased has the charge, gets into a quarrel with him, and, at the time and in the manner previously declared, unlawfully kills him. Upon this, the inference that the deceased was theperson whom he had previously resolved to kill becomes irresistible, until there be some facts to repel it. An act was done precisely of the kind which, but a few hours before, he had resolved to do, and prepared the means to execute; and it was done at *Page 275 
the time determined on with the means prepared; and the conclusionmust be that this was the act so designed, unless there be some indications that a different act of the same kind was contemplated. What was the evidence to repel this conclusion? No more than this: that immediately before the deed was committed he received from the deceased such a provocation as would have been sufficient, if there had been no malice, to excite high passion. Admit that this fact had some tendency to weaken the inference, to render it somewhat less conclusive, it, nevertheless, left the question of fact, who was the object of his vengeance, one fit for the determination of the jury. It is to be remembered that provocation never disproves malice; it only removes thepresumption of malice, which the law raises without proof. A malicious killing is murder, however gross the provocation. But it is argued that, as the act of killing in this case followed immediately after provocation, the legal presumption from the act is that it was committed without malice, and therefore it cannot be regarded as evidence at all to establish malice. The answer is, that the act of killing was not relied on as evidence ofmalice. There was proof aliunde of malice, of a fixed determination to kill. The act of killing, like any other act, corresponding in its circumstances with a previously ascertained purpose, is evidence, (360) because of this conformity, to designate the object of the intended action, and therefore, though not proof of malice, it may point out thedirection of ascertained malice. If, in a crowd, I tread on a man's toes it may well be presumed that the act was accidental; but if it appear that I went into the crowd with the purpose to render that insult to some person, then certainly the act would be evidence to point out the individual whom it was my purpose to insult. In forming a judgment upon the question, how far the fact of provocation weakened the inference that the deceased was the object of the avowed vengeance of the prisoner, there were other circumstances in the case proper to be taken into consideration. It appeared that the deceased had been employed to keep a shop in Raleigh, belonging in part to the father of the prisoner. The only intimation, previously given, of the unnamed object of his enmity is to be found in the exclamation, "Is it not a shame that I should have to work all day in the hot sun?" That night, at the shop, when forbidden by the deceased to sleep there, he exclaimed: "It is hard that I cannot go to bed in my father's house." And, after the fatal deed was done, instead of expressing sorrow for a rash act, committed in the heat of passion, he uttered a horrid wish and imprecation, indicative of a deep-rooted hatred against the deceased. These circumstances, connected with the fact that, on the part of the prisoner, nothing was shown tending in the slightest degree to designateany other object of his vengeance, seem to point out the deceased as the person *Page 276 
who, supplanting him in his father's shop, being placed in any easy situation, while he was obliged to toil "all day in the hot sun," was regarded by him with the deadly hostility thus avowed, executed, and unrepented of.
But admitting that the deceased was the object of the prisoner's vengeance, it is denied that there was evidence to warrant a finding that the prisoner went to the shop with intent to provoke a quarrel and gratify his vengeance. For reasons which will hereafter be assigned, we hold that the charge would have been perfectly correct had it (361) omitted the inquiry as to an intent to provoke a quarrel, but had left the question of murder to depend solely on the fact whether he went to the shop with the intent to kill the deceased. But we are entirely satisfied that the circumstances were relevant and fit to be considered, if the inquiry were material, upon the question of intent to provoke a quarrel. Let us advert for a moment to the most material of those circumstances. The prisoner has formed a purpose of most deadly vengeance against the deceased, and prepared the means to execute it. With these means concealed, he goes to the place where the deceased is ordinarily to be found. The first act he is engaged in, after arriving there, is a quarrel with a third person. This quarrel the deceased had a right to suppress, and does suppress. But the prisoner treats this conduct as the taking of a part in the quarrel against him. The next act is an attempt to take possession of the bedroom connected with the shop. The case does not state that this was the bedroom of the deceased, and however probable the presumption that such was the fact, we do not feel ourselves authorized to assume it. But it is not pretended it was the bedroom of the prisoner; it is not shown that he had ever occupied it, or had nay right to occupy it; and, indeed, the only pretense of right set up by him was that his father was one of the owners of the shop. Unquestionably the deceased, who represented the owners of the shop and was clothed with their rights, was fully justified in forbidding this assumption of dominion there, and the perseverance in such assumption was a rude and insulting act. If the deceased, upon this, had done no more than turn him out of doors, the deceased would have been wholly blameless in the transaction. But according to the testimony of Pollard (which for the purposes of the present inquiry must be presumed to be true), in turning him out of doors, he kicked the prisoner and was instantaneously shot. Now, it is not for us, nor was it for the judge below, to draw the conclusion of fact that the prisoner did go to the shop with the intent to bring on a quarrel and execute the purpose of death which he had formed against the deceased; but if the intentions of men are to be ascertained by their acts, these acts of the prisoner (362) were fit for the consideration of the jury, to enable them to *Page 277 
judge what was his intent. He had resolved to kill; he went prepared to kill; he brought on a quarrel with the object of his vengeance, and in that quarrel did kill him. Can it be questioned that it is a proper inquiry, Did he intend what happened?
We have said that the inquiry, whether the prisoner intended to bring on a quarrel, was not a material one for determining the character of his crime. We take the principle to be clear that when a deliberate purpose to kill, or to do great bodily harm, is ascertained, and there is a consequent unlawful act of killing, the provocation, whatever it may be, which precedes the act, is to be thrown out of the case and goes for nothing, unless it can be shown that this purpose was abandoned before the act was done. There can be no such thing in law as a killing with malice and also upon the furor brevis of passion; and provocation furnishes no extenuation, unless it produces passion. Malice excludes passion. Passion presupposes the absence of malice. In law they cannot coexist. Murder is the killing with malice aforethought. If there be killing, and malice aforethought be shown, both of the constituents of the crime are established, and the act is murder. Certainly, however, it must be admitted that the most determined purpose to kill may be repented of, and malice, however deeply settled, may be abandoned. But there must be something to show that this has been done, before it is presumed. There is a locus, or rather a tempus penitentiae, allowed, but to avail anything it must be employed for repentance, and repentance of a criminal purpose is not presumed if the act be done which that purpose contemplated. It is not, therefore, the legal presumption, where a provocation intervenes between the expression of malice and the act of killing, that the slaying was upon passion and not upon malice. The authorities relied upon to establish this position, when fairly interpreted, lay down the opposite doctrine, that the presumption in such cases is, unless there be proof to the contrary, that the killing was upon malice and not upon passion. It is admitted that the passage produced from Mr. East, a very respectable compiler of the criminal law, taken per se, does favor the view pressed by the prisoner's counsel. His language is, "But where fresh provocation intervenes (363) between preconceived malice and the death, it ought clearly to appear that the killing was upon the antecedent malice; which may be difficult in some cases to show satisfactorily, if the new provocation were a grievous one. In such cases, says Hawkins, it shall not be presumed that they fought on the old grudge, unless it appear by the whole circumstances of the fact." 1 East, ch. 5, sec. 12. It is to be remarked, however, in the first place, that this passage is the concluding part of a section wherein he has been considering how far a provocation received may rebut an implication of malice; and, after *Page 278 
laying down the proposition that a provocation, immediately preceding the act, will rebut that implication, "but that it will be no answer in alleviation to express malice proven," he proceeds to state that "therefore, if, upon a provocation received, one party deliberately and advisedly denounce vengeance against the other, and afterwards carry his design into execution, he will be guilty of murder, although the death happened so recently after the provocation as that the law might, apart from such evidence of express malice, have imputed the act to unadvised passion"; and then follow, as a qualification or exception, the words first quoted. Taking, therefore, the whole section, its meaning is this: provocation will not extenuate a killing to manslaughter, although the act speedily follows upon the provocation, and before the blood, if raised to the boiling point of passion, has time to cool, if from the advised and deliberate expression of malice it can be collected that the blood was not thus heated by that provocation; but if no act of killingthen take place, and an additional provocation be received, and thereupon
the person so provoked slay his adversary, it is a fair presumption, unless the circumstances of the fact show the contrary, that this superadded provocation did produce such highly excited passion, and the act of slaying proceeded from this passion. Thus understood, it does not conflict with the views we have taken. But Mr. East in this passage refers to Hale and Hawkins, who are justly regarded, not as respectable compilers, but as standard authorities; and what is their language? (364) Mr. East refers to Hawkins, Book 1, ch. 13, secs. 29, 30 (page 97). Hawkins' words are: "If two happen to fall out upon a sudden, and presently agree to fight, and each of them fetch a weapon, then one kills the other, he is guilty of manslaughter only, because he did it in the heat of blood. And such an indulgence is shown to the frailties of human nature that where two persons, who have formerly fought on malice, are afterwards to all appearance reconciled, and fight again on a fresh quarrel, it shall not be presumed that they were moved by the old grudge, unless it appear by the whole circumstances of the fact." Mr. East refers also to 1 Hale Pleas of the Crown, 452. The entire passage in Hale is this: "If there be an old quarrel between A. and B., and theyare reconciled again, and then upon a new and sudden falling out, A. kills B., this is not murder; but if upon circumstances it appears that the reconciliation was but pretended or counterfeit, and that the hurt done was upon the force of the old malice, it is murder." Here we have the true doctrine. The act shall be attributed to passion produced by provocation, and not the old grudge, if it appear that the old grudge has ceased. One of the cases put by Hale on the next page is, it would seem, decisive of this point: "If A. challenge B. to fight; B. declines the challenge, but lets A. know that he will not be *Page 279 
beaten, but will defend himself; if B., going about his occasion, wears his sword, is assaulted by A. and killed, this is murder in A.; but if B. had killed A. upon that assault, it had been se defendendo, if he could not otherwise escape; or bare homicide, if he could escape and did not. But if B. had only made this a disguise to secure himself from the danger of the law, and purposely went to the place, where probably he might meet A., and then they fight and he kills A., then it had been murder in B.; but herein circumstances of the fact must guide the jury." If B. had formed no determination to fight, but intended only self-defense, and met A. accidentally, then the assault upon him would have excused the act of killing altogether, if necessary to his own safety, or extenuated it to manslaughter, if not required by such necessity. But if in truth, notwithstanding his declaration to the contrary, he had formed the purpose to fight, and went to the place to execute (365) that purpose, such an assault would be no excuse or alleviation, and his crime would be murder; and the inquiry for the jury is, from the circumstances, Was it his purpose to fight, and did he go with that purpose? Such is regarded settled law in the courts of England at this day, where, in consequence of the numerous cases which call for the exercise of great legal discrimination, precision in the rule on this subject may justly be expected. In the late case of the Queen v. Kirkham, 8 Car. and Pay., 115 (34 E. C. L., 318), where a father stood indicted for the murder of his son, it appeared in evidence that the act of killing was preceded by such an immediate act of provocation as would extenuate the crime to manslaughter, unless malice was shown. The crime was committed on Saturday, and testimony was given of threats to kill the deceased, uttered by the prisoner on the preceding Monday and Wednesday. The jury was instructed that the question of manslaughter or murder depended upon the fact whether these threats were the mere ebullitions of momentary anger or the expressions of a deliberate purpose; "so that if they believed that, on the Monday or Wednesday before, the prisoner used the threats deliberately,then all the quarreling and wrestling might be dismissed from their consideration."
In the observations made upon the objections to the instruction given, we have unavoidably anticipated much that is applicable to the other objection, because of instruction not given. It will be sufficient for us now to remark, in relation to this objection, that provocation, as such, is not an extenuation of the act of killing, although passion, consequent upon provocation, may extenuate; that the true question is, whether the act be the result of such passion or of malice; and that the relation of good or ill will, prevailing between the parties, is all important in leading to the decision of that question; and that when the existence of deliberate malice in the slayer is once ascertained, its continuance, down *Page 280 
to the perpetration of the meditated act, must be presumed until there is evidence to repel it. What that evidence should be it is hazardous to define. But there must be some evidence, and, without it, the (366) jury cannot rightfully find, or the court give an instruction implying that they may find, a discontinuance of deliberate malice. If a considerable period of time has elapsed between the last indications of the wicked purpose and the killing; if convenient opportunities for gratifying vengeance have passed over, and no use was attempted to be made of them; if an apparently amicable intercourse has taken place between the parties in the meanwhile: these, and such as these, would be circumstances well worthy of the consideration of the jury, as tending to show a change of intention. True, it is in the power of Him in whose hands are the hearts of his creatures to effect this change in the twinkling of an eye, and He alone can know with certainty whether it hath or hath not been made. But men, fallible men, obliged to judge of human motives, and yet having no means of judging but by external indications, are compelled to pronounce the unlawful deed the consequence of the wicked purpose, unless there be some evidence, which their understandings can discern, that such purpose had been relinquished. In the case before us there is one thing which we can pronounce with certainty. If the prisoner did go to the place, where he killed the deceased, with intent to kill him — and so the jury have found, and so, in our opinion, they were warranted to find — there was no evidence, however slight, showing, or tending to show, that this intention was abandoned before the act was done. The decision of this Court must be certified to the Superior Court of Wake, with directions to proceed to judgment and sentence of death against the prisoner, agreeable thereto and the laws of this State.